Thank you, Your Honors. May it please the Court, Corey Ford on behalf of Appellant Tom Cook, I'd like to reserve three minutes for rebuttal. Your Honors, this is a textbook Title VII retaliation case where the District Court failed to apply the proper McDonnell-Douglas burden-shifting framework, and then failed to consider the minimum burden that is required to show a causal link and pretext at summary judgment. At its core, when the appropriate burden-shifting framework is applied, there's really two issues here on appeal. The first issue is whether the District Court appropriately found that timing alone was Cook's only argument and not enough to infer a causal link. The second main issue is whether the District Court appropriately found that there was an independent basis to terminate Cook to ignore any burden-shifting analysis under McDonnell-Douglas. Starting with the timing aspect on the first issue, this Court has routinely held that close proximity and timing alone may support an inference of retaliation sufficient to survive summary judgment. It's even went as far as saying close proximity and timing is strong evidence of retaliated motive. Your Honors, in this case, the termination occurred 23 days after Mr. Cook reported, and eight days after he was unexpectedly interrogated by the two senior HR representatives for Uniment Colonial Life. The District Court simply ignored this timing evidence, despite the abundance of cases that it was provided where this Court has inferred such a causal link could be established. I mean, this Court has even went as far as saying in a three to eight-month range, that's easily within the range to establish such causation. Well, Mr. Ford, you're not, I mean, as I understand it, you weren't relying on timing alone. And so I guess my first question is, did the District Court misconstrue the arguments and the other evidence in the record to support at least tribal disputes about the reasons for the firing? Yeah, I think that was going to be the next point I make is we weren't just making a timing argument. Obviously, that's relevant here. But we were also, we also had other evidence that suggested there was, you know, but for cause here. So what other evidence would you point to, for example? Okay, so for evidence I would point to is when he made the report, before that, so the alleged incidents where he was terminated, there's two incidents, right? And then there's a few other things. They allege something happened four and six months prior before he reported. Both of those incidents are, I would argue, are in dispute. But in terms of the reporting and a but-for cause, after he reported it is when they basically lumped him into this investigation and to the boss, Webb, who was engaging in this conduct. Prior to that, no one had ever reported any behavior, any alleged inappropriate behavior from him, despite it being company policy to do so. No one in the HR or the uppers were aware of this behavior. Well, he hadn't reported Webb, right? Right. Even though it was company policy to do so. Well, he did report Webb. Eventually, but not when he first knew, right? Well, I think he reported him once he saw actual physical and egregious behavior. There was the time before at the thing where he saw them passing notes between each other and Ms. Schoenwald mentioned to him that, you know, she's going to handle it and take care of it. And then as the Dallas trip rolled around, he personally witnessed Webb be completely out of line, touch her, grab her face, call her sweetie, things of those natures. So that conduct was completely out of line? Yes. What he witnessed? Yeah. So here's my question. I tend to agree with you that the district court should have gotten past the prima facie case and then should have reviewed the argument that even if there was a prima facie case under the McDonnell Douglas burden shifting, that the employer had presented sufficient evidence of non-protextual reasons for termination. And with my looking at the evidence and the descriptions of what witnesses reported that your client did, it strikes me that that conduct, even if disputed by your client, is conduct that a reasonable employer would terminate somebody based on. I'm not going to go through the details of it here in open court. But the fact that your client has some disputes about the details or what exactly happened doesn't mean that the employer didn't believe it or doesn't create a triable issue of fact as to the employer not believing it. So tell me why this evidence that the employer relied on is protextual in your view, why there's a triable issue of fact as to pretext? Because it's inconsistent and unworthy of credence. I'm sorry. Can you speak up a little bit? Yeah. It's inconsistent. And there's contradictions to that evidence. I mean, if you look at the FaceTime gestures alone, what they did when they interrogated Mr. Cook and Ms. Schoenwald is they confiscated their phones. And then we went back and looked at the call logs on Ms. Schoenwald's phone. It's undisputed that the witness who was alleging inappropriate FaceTime gestures in the two times he alleged it, those times don't show up on the call logs. So it's undisputed that if you look at Ms. Schoenwald's phone and view the facts in favor of Mr. Cook, that that didn't even happen. But that doesn't mean that the employer didn't believe it. I mean, Ms. Harley was the one leading this investigation. She didn't have the ability to terminate. It seems like she authored the termination letter too for Mike Keller, who didn't sign, review, or know anything really about it. She ultimately was the one who was supposed to look into these investigations and make sure they were confirmed and had supporting witnesses. I mean, she had documentary evidence with the FaceTime gestures that proved otherwise. I mean. What was that? Huh? What was that? It was the call logs. Well, that doesn't prove otherwise. I mean, call logs aren't definitive as to whether something happened or didn't happen or might have happened at a slightly different time. But doesn't the case law say that there has to be evidence that the employer didn't believe it? A triable issue of fact as to whether they didn't believe it. It doesn't turn on whether it happened or not. It turns on whether the employer actually believed it happened. Right. I think that's the second prong in the burden shifting framework. Like, I think Harley, she honestly believed that those reasons were legitimate. But then when you start looking at things and looking at some of the evidence, you know. I found it notable that part of the record shows an allegation that Webb threatened, is it Koch? Yeah, Cook.  Yeah. Saying, you know, in response to if she reported to HR, you know, I'll make her life a living hell and my guys will say anything I need them to say. I'll throw my weight around and this will never go anywhere. And if you support her, then you're against me. Basically, I'm doing the same thing to you. Doesn't that at least raise an inference that there may have been people, you know, the employer did know about these things and was retaliating? At least to me, it raises a tribal dispute as to the motivation of the employer for firing someone in less than a month. And Sean Holtorf, the guy who reported FaceTime, was one of Webb's guys, essentially. So he was hired by Webb and obviously made these comments about the FaceTime gestures. If you look at the inappropriate dancing. Can I ask about the FaceTime gestures, because that was confusing to me. As I understand it, the other employee that was reporting it said that it was Heather Schoenfeld that was making these inappropriate gestures over FaceTime to your client. Why would he be fired for nepotism over actions that she was taking over FaceTime? That's a question I have, too. You know, it's shocking that they said he was playing favoritism to her, but then also saying that there was some harassing behavior towards her as well. I just don't see how the two correlate. And then also to the nepotism thing. He was never at any point her direct supervisor, which if you look at the policy, that's something. It sounds like that's disputed because I think he alleged. There seems to be some inconsistency there because I think in the complaint, he says that he was a supervisor. But then in the deposition, he said that he wasn't. So it's unclear whether he was or was not, isn't it? I think it's disputed. You know, our complaint may have referenced that. But I think what came out in the case is that at no point he had a supervisory role over her. I'm looking at ER 102, Ms. Harley's deposition. In your investigation, was Sean the only person who made claims that Mr. Koch and Ms. Schoenwald allegedly made sexual gestures over FaceTime? No, Tom admitted to it. Question, Tom admitted to it? Yes. What did he admit to? He admitted that he does FaceTime and that that did occur. The gestures and the blanking off gestures. He admitted that to Matthew McWilliams. Did Mr. McWilliams tell you that? Yes. That's pretext? Well, I mean, in terms of when you look at McWilliams' testimony and you look at Mr. Koch's testimony, Mr. Koch denies that. He said that's not happening. He said that he never engaged, that he did engage in FaceTime gestures. He just never engaged in any appropriate FaceTime gestures with her. And then when we look at Mr. McWilliams' testimony and also his notes, there's nothing to suggest that Tom Koch in his notes admitted to him of that. And he doesn't recall as much on his testimony. So basically what we have is Harley as, you know, basically the lead horse in this whole thing. And it's basically her words versus everyone else's words. And that's the reason, you know, she stamped the termination, essentially. Well, it's also in Sean's, I guess, their notes at SCR 164, right? Reflecting this where it says words I'm not going to use, but she was FaceTiming, doing sexual gestures with him, gestures pretending to be blanking off various other things, giving various things. So this is another person reporting this, right? I would say those are probably questions he lined up to ask him. But I don't see anything where it's saying he confirmed that that happened. He admitted to that. But this is I mean, but Sean was the other employee that reported the FaceTime. As I understand it, there was no one else that observed this, right? It was him. No, there was no one else who observed it, despite other people being present at these events that he was at, that people were at, you know, and could visibly see Tom Cook. I mean, it wasn't like it was just Sean and Tom at these events. I mean, one was like at a basketball game, and the only person who saw it was Sean. If let me ask this, it wasn't clear to me if the district court, and I think this is your argument, ever got past the prima facie stage. So if there's error at that stage at the first step of the McDonnell Douglas framework, are we even able to presume that had it gone on to other steps that the employer did give a I mean, would we even go back, go further into the McDonnell Douglas framework? Or would we send it back for the court to just reanalyze, you know, getting past prima facie and then asking the employee, actually shifting the burden to the employer to give a non, you know, a neutral reason and then developing evidence about pretext. And then have the court essentially look at pretext? In the first instance, because it doesn't seem to me that the district court actually did the analysis of a neutral reason and whether that was pretextual or not, because it stopped at the at the prima facie stage. Yeah, no, I think what they did is they just said there was an independent basis to determine. I don't think they engaged in any of the appropriate. I agree with you, but we all the evidence is in the record, whatever it whatever it shows. And we do a de novo review of summary judgment, right? Yeah. Did you want to reserve? Yeah, I'll reserve the rest. We asked a lot of questions. We'll give you some additional time for rebuttal. Sounds good. Thank you, Your Honors. May it please the court. Appellant Tom Koch expected a police to turn a blind eye to his inappropriate workplace behavior simply because he reported sexual harassment complaints on behalf of a subordinate. However, Title VII doesn't require employers like a police to simply ignore wrongdoing because someone engages in protected activity. What do we make of the fact that this alleged wrongdoing never never came up until the investigation into Webb commenced? What do we what do we make of that fact that apparently this had been seen several months before, but no one said anything? Your Honor, what matters is under Title VII that employers are required to investigate as soon as they hear reports of any wrongdoing in the workplace. And so once that came to light, that is what occurred in this case, but that does not establish but for causation. Your Honor, there was no evidence that because he reported the retaliation is what led I'm sorry that he reported the harassment is what led to his termination. He fails to make note that the intervening notice when they received those reports is what prompted the investigation. And it was after Harley conducted her investigation that she determined that there was violations of the company policy. Miss Greta, let me you know, because we're at the summary judgment stage and we have to give credence to the non-moving party. It's not about necessarily to me about the beginning of the investigation, but its scope. And when you combine that with the Web, the alleged Web threat that, you know, if someone reports to H.R., I'm going to go after Heather and I'm going to go after you. I'm going to have my guys say what they need to say. And then when the investigation begins, suddenly it takes on this added scope of activities related to the people that were behind the allegations themselves. And you combine that with the firing in less than a month. And it just seems to me that there's enough there that these would be tribal disputes. You know, it may be that the employer rightfully fired for inappropriate conduct, but it could also be at least at a prima facie level that there was a retaliatory motive. Why? Why should this have stopped at the summary judgment stage? Well, Your Honor, to begin with, I do think the district court did evaluate the prima facie case and determined that causation wasn't established. You know, on appeal, this court is just to determine whether there's any basis for affirmance. And here there is a basis because a prima facie case wasn't established. Timing alone does not establish causation in a prima facie case. You have to look to the surrounding circumstances. And that can be found in the Anthon versus North Central County's consortium case. It's the Ninth Circuit case from 2010. And in that case, they held you need to look at the surrounding circumstances. But if we're looking at that here in terms of the prima facie case, the timing was very fast. There were allegations of threats being made. And the person who made the allegations was quickly terminated. I mean, to me, under under our case law, there was a prima facie case here. And the district court, respectfully, just on de novo review, got that wrong. So, I mean, I don't see the no prima facie case as being your strongest argument here. Yes, Your Honor, I'd just like to state and to respond to that is that there was a case, the Fried versus Wynn Las Vegas Ninth Circuit case from 2021 that found that 15 days between the protected activity and the adverse employment action wasn't sufficient to establish causation of the prima facie case. And courts have held that there's no bright line rule of what establishes a temporal proximity to establish the prima facie case. But, Your Honors, even if Appellant had established a prima facie case, which we still maintain that he did not, Appellant provided a legitimate non-retaliatory reason for his termination, which was his violation of the workplace policies. And the burden for employers is one of projection, not persuasion. And so we've met that burden and the district court found. What about the Webb threat? Can you talk about that? Why doesn't that raise a tribal dispute as to the motive for the firing? Well, Your Honor, Mr. Webb was terminated after his investigation occurred and that termination was recommended by Harley herself. So any allegations that he may have made to threaten, you know, that he's going to get away with it didn't actually come to fruition because. And I understand the point. I think that's a way to look at the evidence. But why does that not raise a tribal dispute? An alternative might be that he did actually have some sway in the scope of the investigation. And while he was let go, it happened to impact, you know, Mr. Koch as well. Your Honor, I would argue that that is just speculative and conjecture because there was no evidence that he actually did have any sway. Harley conducted an investigation of the allegations with respect to the karaoke incident. It wasn't just based on her review of the video. Misty herself is the employee that provided that video. She reported that there was conduct going on between appellant and coach. She also testified during that same karaoke event that she had witnessed appellant dedicate, you know, an inappropriate song to an inappropriate object. So Harley investigated that and received third party evidence that that had occurred. But when Mr. Webb was interviewed by HR, he said that it was a different person that was dancing with Heather at that karaoke place, that it was a person named Richard. So I guess it leads me to think that there are just these tribal issues that a trial would have to sort out. You know, Coke is saying he didn't do that dancing. Webb is saying it was someone else. This other interviewee and the person who brought the video saw that it was him. And then the video apparently is corrupted and can't be seen anymore. Isn't there a lot of just swirling factual disputes in this case? Your Honor, I would argue that any factual disputes are not material and do not impact the summary judgment decision. As Your Honor noted, too, what matters is the honest belief that the employers believed when they made that decision to terminate appellant. And at that time, when Harley conducted her investigation, she had no basis to question Sean's testimony, Misty's testimony, or her own review of the video. And also with respect to the FaceTime gestures, McWilliams interviewed appellant and during that interview, appellant admitted that he had engaged in those inappropriate conducts. And that's what McWilliams related back to Harley when she was... But Mr. Coke disputes that. He says that he admitted to having FaceTime calls with Heather, not that he admitted to inappropriate gestures. And then when McWilliams was deposed, he couldn't remember what that conversation, the interview itself and in his own deposition. All that's to say there seems to be multiple sides to this story. I don't know which one's the right one, but it's hard for me to see how this is not an issue that's for trial. Even if the court had gotten past the prima facie stage. Your Honor, in Billa Varmil versus Aloha Island Air Inc., which is a Ninth Circuit case from 2002. In that case, they said that you have to put forward specific and substantial evidence and you can't rely on speculation and conjecture. And it's not enough. Why is it speculation? You have Webb, who was a supervisor over Coke, saying, I will retaliate against you if you or Heather report to HR. And then the interview happens and then the scope of the investigation expands and a person's fired within three weeks. Those are concrete details. It doesn't seem speculative to me. And there are disputes about what happened in this process. Can I ask you about the nepotism policy? The termination letters seem to suggest that nepotism is about just personal relationships. But the policy itself talks about family or romantic relationships. Did the company believe that Mr. Coke was in a romantic relationship with Heather Schoenfeld? Your Honor, first, I would say that the policy is not limited to family or romantic relationships. Harley testified to that. That's on page 92 of the record. And also, close personal relationships are evaluated on a case-by-case basis. But the reason that he was terminated was the perception of favoritism, which needs to be interpreted broadly. I would say the policy itself — I'm looking at the — I'm sorry to interrupt, but I'm looking at ER 185 at the nepotism and personal relationships at work policy. And it says, close personal relationships in the workplace, whether with family members or romantic relationships, can unintentionally create situations involving conflicts of interest, interference with control, and other things. And then further down below, for anyone with management responsibility, no family member or person in a romantic relationship may be hired or employed or within the manager's span of control or in a role that is influenced by the manager. At least that seems to suggest to me that it might be limited in this way. And unless there's evidence that there was a romantic relationship between the two, he may have been fired for retaliatory reasons. Your Honor, if you look further down at that same policy, it should be on page 182 and 184 as well. It says that to avoid a conflict of interest or appearance of a conflict of interest, the definitions of relationships covered in this policy should be interpreted very broadly. But look at the heading right above it. Definitions of relationships, parentheses, family members and romantic relationships. Yes, Your Honor. But underneath that heading, it then states that the definitions should be interpreted broadly. And during Harley's investigation, she said that the policy is not limited to family or romantic relationships. And McWilliams himself, during his deposition, also said that the definitions are interpreted broadly. And that was on page 124 of the record. And so the policy is not just limited to romantic relationships. Your Honor, I guess I would look at the company's policy in its written form before two employees' interpretations of the policy. But all that's to say, and I'm not necessarily saying that the company wouldn't construe this in a broad way and may not have had legitimate reasons to fire these individuals, but it just seems premature to me to decide these things at the summary judgment stage when there are many different ways of arguing the applications of these policies, what happened, and the motivations behind them. Your Honor, with respect to consistent application of the policies, FLEs have consistently applied those policies. They've terminated former managers that were alleged to have engaged in inappropriate conduct under these same policies. That was Scott himself. That was also Tim Martin and also Andre La Flame were terminated. They were in a supervisory role and alleged to have engaged in inappropriate conduct, and they were terminated. Similarly, here, Appellant, once at police, learned that he had engaged in inappropriate conduct, which was sparked through reports of other individuals. It wasn't going, Your Honor, to your comment about Scott Webb maybe influencing the investigation. It wasn't Scott Webb's comments. It was other individuals that were interviewed is what ultimately led Harley to determine that they needed to further investigate. But also on that point, the question is whether the decision maker believed the allegations and at the point that the company was considering whether to terminate Webb and the plaintiff, Webb was not a decision maker in that process, right? Correct. He was not. And there's no evidence that we have that in the investigation, which encompassed both Webb and Coke, that Webb was a decision maker, right? Correct, Your Honor. Was Harley a decision maker? Because I believe she made a recommendation, but she led the investigation, but she didn't decide it herself, did she? She was not the decision maker. She recommended. Who was? Mike Keller was a decision maker. He was the VP of sales at the time. Right. And as I understand your opposing counsel's brief during his deposition, when I looked at his deposition transcript, he didn't know the basis. He could not recall the basis for the terminations. And I believe it was briefed that he believed that he would not fire anyone for not cooperating with the investigation. It wasn't clear that he knew the basis for the termination other than just accepting the recommendations from someone else. Your Honor, at the time he was deposed, he did testify he didn't remember the specifics, but that is not specific and substantial evidence to establish pretexts. Because at the time when Harley reported it and provided the basis to Keller, at that time he agreed that termination was—he recommended that termination occur, which is what ultimately led to Appellant's termination. Otherwise, he wouldn't have been terminated because he made the decision. So at that time, he honestly believed of what he heard, what Harley reported to him and recommended to him actually occurred and that there were policy violations by Appellant at that time. All right. Thank you, Counsel. Thank you. And we'll give you two minutes for rebuttal. Thank you, Your Honors. You know, it seems like this retaliation ultimately boils down to letting a trier of fact decide, you know, whether this was a retaliated motive or whether this was a legitimate firing. Just to touch on a few things, my colleague here mentioned the Fried and Wynn case. That was a case in a 15-day span where the guy was fired after reporting. But he was fired because he allowed underage drinking in a Las Vegas casino, which it's, you know, a big no-no to do that. And so they independently fired him for that. It had nothing to do with his protected activity that he reported. Also, when you look at the case detail notes from Harley, she interviewed 13 witnesses. There's only two witnesses who came forward. And none of the two witnesses, no one else, cooperated their stories. Those were individual witnesses who each reported alleged wrongdoing. But no one of the other 11 witnesses confirmed that. Quite the opposite is true. Like Your Honor pointed out in Webb's interview, he said that it was a Richard, not Tom Cook. So the other thing I'd like to touch on is the Mike Keller termination. He was the decision-maker. He didn't even sign the termination letter. He didn't review it. Harley authored it. There's no evidence of what Harley reported to him and that he accepted her reservations. There's no evidence in that case of that. So other than there's a termination letter that she authored. And then to touch on the nepotism and sexual harassment, he didn't remember even firing anyone ever for nepotism or sexual harassment violations. So when you look at the decision-maker at the end of the day, he was unaware. I mean, it falls back to we have Harley leading this investigation. She lumps Mr. Cook in because she hears two things from two witnesses. There's 11 witnesses who say nothing else. And then ultimately she finds that this behavior is confirmed, which I think it's disputed. We see the call logs that doesn't reflect that. We see in the inappropriate dancing. We see text messages where everyone had a good time. No one reported it. And then also we see. What's your conclude, counsel? That's all I have, Your Honor. Thank you. All right. We thank counsel for their arguments. The case argued is submitted and we are adjourned for the day. All rise.
judges: BENNETT, SANCHEZ, THOMAS